**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **MULFORD CONSTRUCTION CO., INC.,** | **Case No. 26-13271 (LSS)** |
| **Debtor.** | |

**DEBTOR'S EMERGENCY MOTION FOR AUTHORITY TO PAY PRE-PETITION**
**ACCRUED WAGES, PAYROLL TAXES, AND EMPLOYEE BENEFITS**

Mulford Construction Co., Inc. (the "Debtor"), the above-captioned debtor and debtor in possession, by its undersigned counsel, files this *Emergency Motion for Authority to Pay Pre-Petition Accrued Wages, Payroll Taxes, and Employee Benefits* (the "Motion"), and in support thereof states as follows:

### Introduction

Through this Motion, the Debtor seeks Court approval of the fulfillment of the Debtor's employee related obligations with respect to wages, salaries and benefits in the ordinary course of the Debtor's business.  In particular, the Debtor seeks to pay timely in the ordinary course of its business all of its employee related obligations that arose prior to the bankruptcy filing such that there is minimal, if any, interruption to the Debtor's approximately 135 employees.

### Jurisdiction And Venue

1. This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334 and *Standing Order* 2012-05 from the United States District Court for the District of Maryland. This matter is a core proceeding, pursuant to 28 U.S.C. §157(b)(2)(A). Venue lies properly in this Court, pursuant to 28 U.S.C. §§ 1408 and 1409.

1

2.	The statutory bases for relief requested herein are sections 105(a) and 507(a) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "<u>Bankruptcy Code</u>") and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>").

## The Chapter 11 Case

3.	On March 27, 2026 (the "<u>Petition Date</u>"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code. No request for the appointment of a trustee or examiner has been made in this chapter 11 case, and no committee has been appointed or designated.

4.	The Debtor is proceeding under the Court's Complex Chapter 11 Case Procedures as set forth in Appendix I to the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Marland (the "<u>Local Rules</u>"). *See* Md. L. Bankr. R., Appendix I.

## The Debtor And Its Business Operations

5.	The Debtor is a Maryland corporation that provides construction services for both residential and commercial projects.  It has over 135 employees and operates in the mid-Atlantic area of the United States, with a significant presence in the State of Maryland.

6.	The Debtor provides services in the heavy civil construction area, with the core of the Debtor's business involving site preparation and management for significant construction projects.  The Debtor also provides construction services related to the installation of utilities; piping for water, sewer and storm drains; roadwork; commercial landscaping; and related site clearing and grading.

7.	The Debtor is currently in its fiftieth year of business.  Despite its longevity, recent issues have taken a toll on the Debtor's cash flow forcing it to seek protection under

Chapter 11 of the Bankruptcy Code. The conflation of these events has caused a recent significant reduction in the amount of revenue being generated by the Debtor. Despite revenue of approximately $58.4 million in 2024, the Debtor's revenue dropped to approximately $56.4 million in 2025.

8. In 2024, the Debtor was working on a significant residential development project known as "Smith Home Farm." Due to certain improper activities of other parties to the project that were not in the control of the Debtor, the project was foreclosed upon and ceased to move forward. The Debtor had a significant amount of work on the project at the time the project stopped and was left with approximately $3 million of unpaid invoices. Despite obtaining a judgment in the Debtor's favor in the amount of approximately $2.7 million in July 2025, the Debtor has received little payment on that judgment.

9. The result of the foregoing has had a significantly negative impact on the Debtor's revenue while simultaneously causing the Debtor to accrue a significant amount of expenses related to the project. Exacerbating the issue, the weather this past winter caused a significant disruption to many of the Debtor's remaining construction projects, limiting the Debtor's ability to complete work on these projects, resulting in a further significant reduction in the Debtor's cash flow.

10. In an effort to bridge the revenue gap facing the Debtor, the Debtor entered into multiple loan transactions in the form of merchant cash advance ("MCA") agreements with various lenders over the past year or so. The MCAs have extremely high effective interest rates built into their agreements with even more extreme and aggressive repayment terms. The funds being drained from the Debtor's account due to the MCAs has made it impossible for the Debtor to continue its operations without the relief afforded by Chapter 11. A significant goal of the

6541984.3

Debtor in this bankruptcy case is to address the myriad issues concerning the MCAs as part of an overall restructuring of the Debtor's balance sheet.

11. The Debtor has a significant amount of future revenue under contract with existing jobs that comprise a significant asset of the Debtor's estate. One of the main purposes of this bankruptcy is to provide the Debtor with a runway to realize the revenue of those projects while providing creditors an opportunity for a distribution on pre-petition debt through a plan of reorganization. The only way to realize on this future revenue is for the Debtor to remain in business as a going concern. Additionally, as part of its restructuring, the Debtor has not ruled out seeking additional capital or perhaps a potential sale of some or all of the Debtor's assets during this bankruptcy case if doing so is feasible and beneficial to the Debtor's estate and creditors.

**The Debtor's Workforce**

12. As of the Petition Date, the Debtor employs approximately 135 full-time employees (the "Employees"). The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtor's estate. The Debtors' Employees include administrative, management, and manual laborers. The Debtor's failure to honor its obligations to the Employees could severely threaten the Debtors' ability to continue as a going concern at this crucial juncture.

13. More importantly, many of the Employees rely on their compensation and benefits to pay daily living expenses and secure services central to the Employees' health and welfare. As such, the Employees would be exposed to significant hardship if the Debtor is not permitted to continue satisfying the compensation and benefits obligations described herein.

14.     In the ordinary course of business, the Debtor's regular payroll is processed and paid on a weekly basis.  Employees receive their paycheck on Friday for the previous week's earnings.  The last payroll was made on March 27, 2026 for the week ending March 20, 2026 (the "March 27 Payroll").  The total amount of the March 27 Payroll was $192,693.16.

15.     The next payroll is payable in the ordinary course of business on April 3, 2026, covering the week ending March 27, 2026 (the "Pre-petition Payroll").[1]  The amounts related to the Pre-Petition Payroll are estimated to be[2]:

a.  Wages and Salaries (including withholdings):   $203,212.74

b.  Employer related taxes:   $15,145.50

c.  Employer paid benefits:   $1,950.83

Attached hereto as **Exhibit A** is a breakdown of the Pre-Petition Payroll.

### Wages and Salaries

16.     Payments to Employees are handled on a centralized basis and are paid directly out of the Debtor's bank account. The Debtor calculates the payroll obligations, handles direct deposits, and pays payroll taxes and other applicable deductions required by law to the respective recipients.

17.     The net gross amount for wages and salaries for the Pre-petition Payroll equals $203,212.74.  The Debtor seeks the Court's approval of the payment of all wages and salaries related to the Pre-petition Payroll in the ordinary course of business, in addition to the payment of all withholdings from Employee paychecks to the appropriate taxing authorities.

18.     The Debtor also seeks relief herein to the extent that any payments from the

---

[1]     Given the timing of the filing of the bankruptcy petition initiating this case on the afternoon of March 27, 2026, most of the amounts related to be approved herein are pre-petition obligations of the Debtor.

[2]     The estimates provided are based on a preliminary run of the Pre-Petition Payroll.  At the time of the filing of this Motion, the Pre-Petition Payroll has not been fully processed, and the amounts sought to be approved may change slightly as a result.

6541984.3                                          5

March 27 Payroll[3] have not cleared as of the Petition Date and to otherwise continue payroll in the ordinary course of the Debtor's business. The Debtor seeks to minimize the impact of this bankruptcy filing on the Debtor's numerous employees.

**Employee Benefits**

19.     In the ordinary course of business, the Debtor maintains various employment benefit plans and policies, including, without limitation, medical and prescription plans, dental plans, a vision plan, voluntary life insurance and accidental death and dismemberment insurance, and short-term and long-term disability insurance (collectively, the "Employee Benefits"). The majority of the cost of these benefits is borne by the Employees.  Those paid, at least in part, by the Debtor are described below.

20.     The Debtor offer its Employees a non-traditional group health insurance plan through an Individual Coverage Health Reimbursement Arrangement ("ICHRA").  Each of the Debtor's Employees is given a chance to sign up for their own health insurance through the individual health insurance marketplace.  Employees are their own administrators and are responsible for remitting their own monthly premiums.  The Debtor provides a monthly reimbursement up to a predetermined allowance based on the individual's age, state, and whether they are salary or hourly.  The reimbursement is paid once a month on the employees' paychecks and is limited by their monthly premium or the monthly allowance, whichever is less. Employees have to prove on a quarterly basis that they are still maintaining their health insurance and remain current on their monthly premium.  There is no amount due for pre-petition ICHRA reimbursements.

---

[3]      The vast majority of the Debtor's employees are paid by direct deposit.  Accordingly, the amount of any uncashed paychecks, if any, will be *de minimis*.

21.     The Debtor also offers a match to Employees' 401(k), as well as a match for FSA accounts, at 4% each.  With respect to the Pre-Petition Payroll, the Debtor owes $1,771.58 for 401(k) matches and $179.25 for FSA matches, for a total of $1,950.83 these benefits.

22.     The Debtor also withholds certain funds from certain employee paychecks for garnishments and child support payments.  These do not constitute an obligation to be paid by the Debtor; nevertheless, the Debtor seeks authority to pay these amounts to their applicable recipient in the ordinary course of the Debtor's business.   These amounts aggregate approximately $750 per pay period.

### Accrued PTO Obligations

23.     The Debtor offers paid time off ("PTO") benefits to its Employees.  Many of its Employees have accrued PTO benefits that have not been used as of the Petition Date.  Only five (5) of the Employees have accrued PTO benefits that would, when coupled with the amount of pre-petition wages for each sought to be paid herein (the "Total Wage Claim"), exceed the priority cap of $17,150.  However, many of the Employees have accrued PTO that precedes the 180 days before the Petition Date.  Accordingly, the Debtor only seeks authority to honor those Total Wage Claims that do not exceed the $17,150 statutory cap of 507(a)(4) and have accrued in the 180 days preceding the Petition Date.  Employees retain their right to assert any claims in excess of their Total Wage Claim in the bankruptcy case.

### Reimbursable Expenses

24.     Prior to the Petition Date, and in the ordinary course of its business, the Debtor directly or indirectly reimbursed Employees for certain eligible expenses (the "Reimbursable Expenses") incurred in connection with their employment. On a rare occasion, an Employee might incur Reimbursable Expenses through the use of their personal credit cards or own cash.

Because Employees do not always submit expense reports with perfect regularity, it is difficult to determine with precision the aggregate amount of outstanding Reimbursable Expenses. However, the Debtor believes that, as of the Petition Date, there are no accrued and outstanding pre-petition obligations with respect to Reimbursable Expenses. Notwithstanding the foregoing, the Debtor is requesting that to the extent that there are yet to be identified pre-petition Reimbursable Expenses, it be permitted to pay up to $500 per employee, but in no event greater than $2,500 total, without further Court approval.

### Relief Requested

25.      The Debtor requests that the Court authorize the payment of the Pre-petition Payroll in the ordinary course of the Debtor's business, including (i) all salaries and wages, (ii) Employee Benefits, primarily for 401(k) and FSA match payments, (iii) all corresponding payroll taxes that accrued prepetition, (iv) any Reimbursable Expenses that may have accrued prepetition or to the extent that any amounts have not cleared, (v) the payment of garnishments and child support obligations that were withheld; and (vii) any amount to be paid by the March 27 Payroll that accrued on the Petition Date prior to the commencement of this chapter 11 case that is yet to clear.

26.      Because these obligations of the Debtor accrued prepetition, all respective wage payments constitute priority claims under section 507(a)(4) of the Bankruptcy Code. Similarly, all of the prepetition payroll taxes to be paid with respect to the Prepetition Payroll constitute priority claims under § 507(a)(8)(D) of the Bankruptcy Code. Importantly, no Employee will be paid wages and benefits in excess of the statutory cap of $17,150 set forth in 507(a)(4) of the Bankruptcy Code.

27.     Additionally, payment of the employee related obligations is justified under section 105(a) of the Bankruptcy Code and the widely recognized "necessity of payment doctrine." Under the "necessity of payment doctrine" and section 105(a) of the Bankruptcy Code, courts have permitted immediate payment of prepetition obligations where necessary to preserve or enhance the value of a debtor's estate for the benefit of all creditors, specifically including payment of prepetition claims of employees. *In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175-76 (Bankr. S.D.N.Y. 1989) (finding that payment of prepetition wages, salaries, reimbursable business expenses and health benefits to active employees of debtor airline authorized); *In re Chateaugay Corp.*, 80 B.R. 279, 286-88 (S.D.N.Y. 1987), appeal dismissed, 838 F.2d 59 (2d Cir. 1988) (approving lower court order authorizing debtor, prior to plan stage of case, to pay prepetition wages, salaries, expenses and benefits); *In re Gulf Air Inc.*, 112 B.R. 152, 153-54 (Bankr. W.D. La. 1989) (permitting payment of prepetition wages, benefits and expenses as necessary to maintain going concern values and to assist reorganization efforts).

28.     The Employees each perform an essential function for the Debtor's ongoing operations. Any disruption in the Debtor's operations from Employee resignations or poor morale could have significant negative effects on the Debtor's reorganization efforts.  Most of the Debtor's employees (and their families) are dependent upon the wages, salaries, reimbursements and other benefits they receive from the Debtor.

29.     The Debtor believes that, to avoid the risk of such employee resignations and to maintain employee morale, it is critical that the Debtor be authorized to pay the employees certain compensation amounts (subject to the statutory cap) that have been earned under the Debtor's prepetition contractual obligations or practices.  It is also essential that the Debtor continue the employee programs and policies discussed in this Motion in the ordinary course of

6541984.3

business and on an uninterrupted basis.  Payment of these obligations and the continuation of the related programs and policies are essential to maintain employee morale and ensure that the Debtor retains its employees during this critical period

30.     It is in the best interests of the Debtor's estate to avoid disruption of the Debtor's operations.  In addition, the Debtor's employees are essential to the continued management and operation of the Debtor.  If the Debtor fails to pay the Pre-petition Payroll, the Employees will suffer economic hardship, employee morale would suffer, key employees may leave, and the Debtor's ability to provide services would be in jeopardy.

31.     This Court and other courts have recognized the validity of the foregoing justifications for allowing debtors to pay prepetition compensation, deductions, and benefits and, as a result, routinely have granted relief similar to that requested herein. See *In re Fieldstone Mortgage Company*, Case No. 07-21814 (JS) (Bankr. D. Md.); *In re Joan Fabrics Corporation, et al*., Case No. 07-10479 (Bankr. D. Del. April 11, 2007) (CSS) (authorizing the payment of pre-petition wages, salaries and other compensation); *In re Pliant Corporation*, Case No. 06-10001 (Bankr. D. Del. Jan. 4, 2006) (MFW) (same).

32.     The Debtor is requesting that an emergency hearing be scheduled on this Motion, and once scheduled, notice of this Motion and such hearing will be provided to the Notice Parties identified below.

## Bankruptcy Rule 6003 Is Satisfied

33.     Bankruptcy Rule 6003(b) empowers a court to grant relief within the first 21 days after the Petition Date "to the extent that relief is necessary to avoid immediate and irreparable harm." Fed R. Bankr. P. 6003. Payment of the Prepetition Payroll is necessary to avoid immediate and irreparable harm to the Debtor's Employees, and therefore, the Debtor's estate

and creditors. If the Debtor's Employees were to miss even a single paycheck, it could negatively impact the faith of the Debtor's Employees and potentially cause an exodus of Employees that would negatively affect the Debtor's ability to operate its business and successfully reorganize. Accordingly, the Debtor meets the "immediate and irreparable harm" standard of Bankruptcy Rule 6003(b).

## Request For Bankruptcy Rule 6004 Waivers

34.     The Debtor seeks a waiver of (i) the notice requirements under Bankruptcy Rule 6004(a), and (ii) the stay of the order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h), to the extent they are applicable, because the relief requested herein is necessary to avoid immediate and irreparable harm.

## Local Rule 9013-2 Statement

35.     Pursuant to Local Rule 9013-2, the Debtor will not be filing a separate memorandum with respect to this Motion, but will rely solely upon the grounds and authorities set forth in the Motion.

## Notice

36.     Notice of this Motion has been given to the following parties or to their counsel, if known: (i) the Office of the United States Trustee; (ii) the MCAs;  (iii) the parties identified on the Debtor's List of Twenty Largest Unsecured Creditors; (iv) the Internal Revenue Service; (v) the Securities and Exchange Commission; (vi) the Office of the Comptroller of Maryland; and (vii) such other parties that have filed a request for notices in the case.

**WHEREFORE**, the Debtor respectfully requests that the Court (i)approve the payment of the Pre-petition Payroll and all related expenses, including withholdings to the appropriate party, in the ordinary course of business, (ii) approve the payment of any uncleared checks

related to the March 27 Payroll, and (iii) grant such other and further relief as the Court deems just and proper.

Dated: March 31, 2026

Respectfully submitted,

**TYDINGS & ROSENBERG LLP**

*/s/ Dennis J. Shaffer*
Richard L. Costella, Bar No. 14095
Dennis J. Shaffer, Bar No. 25680
One East Pratt Street, Suite 901
Baltimore, Maryland  21202
Telephone (410) 752-9700
Email: rcostella@tydings.com
        dshaffer@tydings.com

*Proposed counsel to Mulford Construction Co., Inc.,*
*Debtor and Debtor-in-Possession*

## Certificate Of Service

I certify that on March 31, 2026, a copy of the foregoing was sent by the means indicated and to the Notice Parties as identified on the Omnibus Certificate of Service, filed contemporaneously with the foregoing.  In order to expedite the copying and transmittal of pleadings to parties in interest, a copy of the Omnibus Certificate of Service was not transmitted with the foregoing. Any party desiring a copy of the Omnibus Certificate of Service may contact the undersigned or may review the original at the Clerk's Office.

*/s/ Dennis J. Shaffer*
Dennis J. Shaffer

6541984.3

12