**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| **In re:** | **Chapter 11** |
| **MULFORD CONSTRUCTION CO., INC.,** | **Case No. 26-13271(LSS)** |
| **Debtor.** | |

**DECLARATION OF KURT FOWLER IN SUPPORT OF
CHAPTER 11 PETITION AND FIRST DAY MOTIONS**

I, Kurt M. Fowler, declare the following under 28 U.S.C. § 1746:

1.      I am the Chief Executive Officer and sole equity holder of Mulford Construction Co., Inc., a corporation organized under the laws of the state of Maryland (the "Company" or the "Debtor").

2.      The Company has been in business since 1976.

3.      On March 27, 2026 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Maryland (the "Court").

4.      I am authorized to submit this Declaration on behalf of the Debtor. I am over 21 years of age, and, if called upon to testify, I would testify competently to the facts and opinions set forth herein. All facts and opinions in this declaration (the "Declaration") are based on: (a) my knowledge of the Debtor's day-to-day operations, business and financial affairs, books and records, and employees; (b) information I learned from my review of relevant documents; (c) information supplied to me or verified by other members of the Company's management; or (d) my experience and knowledge generally. Unless otherwise indicated, any financial information

6542001.1

1

contained in this Declaration is unaudited and subject to change but true and correct to the best of my knowledge as of the date of this Declaration.

5. This Declaration is organized into four parts. Part I provides background information on the Company and its operations. Part II provides an overview of the Debtor's prepetition capital structure. Part III describes the challenges the Company has faced. Part IV provides an overview of the first-day motions for which the Debtor seeks relief.

**I. Background and General Operations**

6. The Debtor is a Maryland corporation that provides construction services for both residential and commercial projects. It has over 150 employees and operates in the mid-Atlantic area of the United States, with a significant presence in the State of Maryland.

7. The Debtor provides services in the heavy civil construction area, with the core of the Debtor's business involving site preparation and management for significant construction projects. The Debtor also provides construction services related to the installation of utilities; piping for water, sewer and storm drains; roadwork; commercial landscaping; and related site clearing and grading. The Debtor is currently in its fiftieth year of business.

**II. Debtor's Pre-petition Capital Structure**

8. The Company does not have any traditional secured bank debt. However, over the past year or so, the Company has entered into several financing agreements with various lenders pursuant to Merchant Cash Advance Agreements (the "MCAs").[1] The Debtor, through its counsel and financial advisors, is in the process of evaluating each of these MCAs to see where they properly fit in the Debtor's capital structure and will address any debt obligations that may exist thereunder as the bankruptcy case moves forward.

---

[1] Undefined capitalized terms herein will have the meaning ascribed to them in the relevant filing.

6542001.1

9.      The Debtor has significant debt obligations to vendors and suppliers for its various construction jobs.  The Debtor estimates this debt to be approximately between $8 and $10 million. The Debtor is continuing to work with its proposed financial advisors to complete its bankruptcy schedules and statement of financial affairs, and as such, the foregoing number may be adjusted after this analysis is completed.

10.      Over the past year, I have personally lent the Company funds to keep operations going.

**III.     Significant Events Leading to Bankruptcy Filing**

11.      Despite its longevity, recent issues have taken a toll on the Debtor's cash flow forcing it to seek protection under Chapter 11 of the Bankruptcy Code.  The conflation of these events has caused a recent significant reduction in the amount of revenue being generated by the Debtor.  Despite revenue of approximately $58.4 million in 2024, the Debtor's revenue dropped to approximately $56.4 million in 2025.

12.      In 2024, the Debtor was working on a significant residential development project known as "Smith Home Farm." Due to certain improper activities of other parties to the project that were not in the control of the Debtor, the project was foreclosed upon and ceased to move forward.  The Debtor had a significant amount of work on the project at the time the project stopped and was left with approximately $3 million of unpaid invoices.  Despite obtaining a judgment in the Debtor's favor in the amount of approximately $2.7 million in July 2025, the Debtor has received little payment on that judgment.

13.      The result of the foregoing had a significantly negative impact on the Debtor's revenue while simultaneously causing the Debtor to accrue a significant amount of expenses related to the project.  Exacerbating the issue, the weather this past winter caused a significant

6542001.1

disruption to many of the Debtor's remaining construction projects, limiting the Debtor's ability to complete work on these projects, resulting in a further significant reduction in the Debtor's cash flow.

14.    In an effort to bridge the revenue gap facing the Debtor, the Debtor entered into multiple loan transactions in the form of "merchant cash advance agreements" with various lenders over the past year or so.  The MCAs have extremely high effective interest rates built into their agreements with even more extreme and aggressive repayment terms.  The funds being drained from the Debtor's account due to the MCAs has made it impossible for the Debtor to continue its operations without the relief afforded by Chapter 11. [2]  A significant goal of the Debtor in this bankruptcy case is to address the myriad issues concerning the MCAs as part of an overall restructuring of the Debtor's balance sheet.

15.    The Debtor has a significant amount of future revenue under contract with existing jobs that comprise a significant asset of the Debtor's estate.  One of the main purposes of this bankruptcy is to provide the Debtor with a runway to realize the revenue of those projects while providing creditors an opportunity for a distribution on pre-petition debt through a plan of reorganization.  The only way to realize on this future revenue is for the Debtor to remain in business as a going concern.

16.    Additionally, as part of its restructuring, the Debtor has not ruled out the seeking of additional capital or perhaps a potential sale of some or all of the Debtor's assets during this bankruptcy case if doing so is feasible and beneficial to the Debtor's estate and creditors.

**IV.    First Day Motions**

---

[2] The effective result of the MCA agreements was that nearly forty percent (40) of the Debtor's revenues were being taken from its accounts on a daily basis.

17.     The Debtor has filed two motions seeking relief on an emergency basis at the outset of this case.  The Debtor has limited the relief it is requesting on a first day basis to only those most urgent matters and anticipates filing several additional motions in the early stages of this proceeding to effectuate a smooth transition into chapter 11.

### a.  The Wage Motion

18.     By the *Emergency Motion for Authority to Pay Pre-Petition Accrued Wages, Payroll Taxes, and Employee Benefits* (the "Wage Motion"), the Debtor seeks to pay its Employees in the ordinary course of business with respect to its upcoming payroll, which covers a pre-petition time period.  The Debtor also seeks to continue with its obligations for pre-petition accrued benefits, subject to the priority amount set forth in Section 507(a)(4) of the Bankruptcy Code.

19.     As of the Petition Date, the Debtor employs approximately 135 full-time employees (the "Employees"). The Employees perform a variety of functions critical to the preservation of value and the administration of the Debtor's estate.  The Debtors' Employees include administrative, management, and manual laborers.  The Debtor's failure to honor its obligations to the Employees could severely threaten the Debtors' ability to continue as a going concern at this crucial juncture.

20.     More importantly, many of the Employees rely on their compensation and benefits to pay daily living expenses and secure services central to the Employees' health and welfare. As such, the Employees would be exposed to significant hardship if the Debtor is not permitted to continue satisfying the compensation and benefits obligations described herein.

21.     In the ordinary course of business, the Debtor's regular payroll is processed and paid on a weekly basis.  Employees receive their paycheck on Friday for the previous week's

earnings. The last payroll was made on March 27, 2026 for the week ending March 27, 2026 (the "March 27 Payroll"). The total amount of the March 27 Payroll was $192,693.16.

22.     The next payroll is payable in the ordinary course of business on April 3, 2026, covering the week ending March 27, 2026 (the "Pre-petition Payroll").[3] The amounts to be paid by the Debtor related to the Pre-Petition Payroll are estimated to be[4]:

    a.  Wages and Salaries (including withholdings):   $203,212.74

    b.  Employer related taxes:   $15,145.50

    c.  Employer paid benefits:   $1,950.83

Attached to the Wage Motion as **Exhibit A** is a breakdown of the Pre-Petition Payroll.

23.     By the Wage Motion, the Debtor requests that the Court authorize the payment of the Pre-petition Payroll in the ordinary course of the Debtor's business, including: (i) all salaries and wages, (ii) Employee Benefits, primarily for 401(k) and FSA match payments, (iii) all corresponding payroll taxes that accrued prepetition, (iv) any Reimbursable Expenses that may have accrued prepetition or to the extent that any amounts have not cleared, (v) the payment of garnishments and child support obligations that were withheld; and (vii) any amount to be paid by the March 27 Payroll that accrued on the Petition Date prior to the commencement of this chapter 11 case that is yet to clear.

24.     Because these obligations of the Debtor accrued prepetition, all respective wage payments constitute priority claims under section 507(a)(4) of the Bankruptcy Code. Similarly, all of the prepetition payroll taxes to be paid with respect to the Prepetition Payroll constitute priority

---

[3]     Given the timing of the filing of the bankruptcy petition initiating this case on the afternoon of March 27, 2026, most of the amounts related to be approved herein are pre-petition obligations of the Debtor.

[4]     The estimates provided are based on a preliminary run of the Pre-Petition Payroll. At the time of the filing of this Motion, the Pre-Petition Payroll has not been fully processed, and the amounts sought to be approved may change slightly as a result.

6542001.1

claims under § 507(a)(8)(D) of the Bankruptcy Code. Importantly, no Employee will be paid wages and benefits in excess of the statutory cap of $17,150 set forth in 507(a)(4) of the Bankruptcy Code.

### b.  The Utility Motion

25.     By the Debtor's *Emergency Motion for Order Determining Adequate Assurance of Payment for Future Utility Services* (the "Utility Motion"), the Debtor seeks the entry of an order (i) determining that the Utility Companies are adequately assured of payment for future utility services by the providing of an Adequate Assurance Deposit as set forth in **Exhibit A** to the Utility Motion, and (ii) prohibiting the Utility Companies from altering, refusing or discontinuing services upon the making of an Adequate Assurance Deposit and the timely payment for post-petition services.  The Debtor seeks this relief on an interim and final basis.

26.     In connection with the ongoing operation of its business, the Debtor requires the utility service from the Utility Companies.  These Utility Companies provide necessary internet, telephone, gas, electric, information technology and related services utilized by the Debtor to conduct its general business operations. Without them, the Debtor likely be forced to stop operating.  The Debtor generally pays the Utility Companies on a monthly basis, with the average monthly cost over the last 6 months being approximately $24,500.

27.     The proposed Adequate Assurance Payments are broken down as follows:

| | |
|---|---|
| Comcast – Internet | $1,277 |
| SMECO – Electric | $1,310 |
| Calvert County – Water/Sewer | $15 |
| Verizon – Phone and Ipads | $9,195 |
| SoMD – Trash Removal | $280 |
| Integris – IT Infrastructure | $12,427 |

28.     The Debtor believes that these proposed Adequate Assurance Deposits, in conjunction with the Debtor's ability to pay for future services in the ordinary course of business,

6542001.1

constitute sufficient adequate assurance to the Utility Companies pursuant to Section 366 of the Bankruptcy Code.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing statements are true and correct.

Executed on March 31, 2026

/s/

Kurt M. Fowler
Chief Executive Officer
Mulford Construction Co., Inc.

Error!