IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)

| | |
|---|---|
| In re: | Chapter 11 |
| **MULFORD CONSTRUCTION CO., INC.,** | **Case No. 26-13271 (LSS)** |
| Debtor. | |

**INTERIM ORDER: (I) AUTHORIZING AND APPROVING POST-PETITION SECURED FINANCING; (II) GRANTING SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (III) AUTHORIZING USE OF CASH COLLATERAL; (IV) MODIFYING THE AUTOMATIC STAY; AND (V) SCHEDULING A FINAL HEARING**

Upon the *Motion for Entry of Order: (I) Authorizing and Approving Post-Petition Secured Financing, (II) Granting Security Interests and Superpriority Administrative Expense Status, (III) Authorizing Use of Cash Collateral, and (IV) Modifying the Automatic Stay* (the "Motion"), filed by Mulford Construction Co., Inc., debtor and debtor in possession (the "Debtor"), pursuant to Sections 105, 361, 362, 364(c)(1), 364(c)(2) and 364(c)(3) of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 4001-1 of the Local Bankruptcy Rules of the United States Bankruptcy Court for the District of Maryland (the "Local Rules"), seeking:

6607907.1

(a)      authorization for the Debtor to obtain post-petition loans, advances and other financial accommodations from Kurt Fowler ("Mr. Fowler") in accordance with the DIP Credit Agreement (as defined in the Motion)[1] and this Interim Order up to the amount of $400,000.00, secured by security interests in and liens upon all of the Post-Petition Collateral pursuant to Sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(b)      authorization for the Debtor to enter into the DIP Credit Agreement, by and among the Debtor and Mr. Fowler (a copy of which is annexed hereto as **Exhibit A** and is incorporated herein); and

(c)      the grant to Mr. Fowler of superpriority administrative claim status pursuant to Section 364(c)(1) of the Bankruptcy Code in respect of all obligations under the DIP Credit Agreement.

It appearing that due and appropriate notice of the Motion, the relief requested therein, and the hearing on the Motion (the "Notice") having been served by the Debtor in accordance with Rule 4001(c) on: (i) the United States Trustee for the District of Maryland (the "U.S. Trustee"); (ii) the holders of the twenty (20) largest unsecured claims against the Debtor's estate (the "20 Largest Unsecured Creditors"), and (iii) those parties requesting notice in the case (collectively, the "Notice Parties").

## BACKGROUND

A.      Petition.  On March 27, 2026 (the "Petition Date"), the Debtor filed a voluntary petition (the "Petition") under Chapter 11 of the Bankruptcy Code. The Debtor continues to operate its businesses and manage its properties as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

---

[1]      Capitalized terms undefined herein shall have the meanings ascribed to them in the Motion.

6607907.1

2

B.　　Jurisdiction and Venue. The Court has jurisdiction over this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M). Venue of this chapter 11 case and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.　　Notice. Under the circumstances, the Notice given by the Debtor of the Motion and the relief granted under this Interim Order constitutes due and sufficient notice thereof and complies with Bankruptcy Rule 4001(c).

D.　　Upon the record made by the Debtor at an interim hearing on the Motion (the "Interim Hearing"), including the Motion, and the filings and pleadings in this chapter 11 case, and good and sufficient cause appearing therefor;

**THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:**

A.　　Findings Regarding the Post-Petition Financing.

(i)　　*Post-Petition Financing*. The Debtor has requested from Mr. Fowler, and Mr. Fowler is willing to extend, certain loans, advances and other financial accommodations on the terms and conditions set forth in this Interim Order and the DIP Credit Agreement.

(ii)　　*Need for Post-Petition Financing*. The Debtor does not have sufficient available sources of working capital, including cash collateral, to operate its business in the ordinary course of its business without the financing requested under the Motion. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees, and to otherwise fund its operations, subject to compliance with the Budget, hereinafter defined (subject to Permitted Variances),[2] is essential to the Debtor's continued viability as the

---

[2]　　For purposes of this Interim Order, the term "Permitted Variance" shall mean, for each two-week period (each, a "Variance Testing Period"), a ten percent (10%) negative variance with respect to the operating receipts and operating disbursements set forth in the Budget on a line item and cumulative basis; provided that any positive variance

6607907.1

3

Debtor seeks to maximize the value of the assets of the estate for the benefit of all creditors of the Debtor. The ability of the Debtor to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangement with Mr. Fowler as set forth in this Interim Order and the DIP Credit Agreement is vital to the preservation and maintenance of the going concern value of the Debtor. Accordingly, the Debtor has a need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of its businesses, minimize the disruption of its business operations, and preserve and maximize the value of the assets of the Debtor's bankruptcy estate (as defined under Section 541 of the Bankruptcy Code, the "Estate") in order to maximize the recovery to all creditors of the Estate.

(v)     *Good Cause*. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtor, its creditors and its Estate, as its implementation will, among other things, provide the Debtor with the necessary liquidity to: (a) minimize disruption to the Debtor's businesses and on-going operations; and (b) preserve and maximize the value of the Debtor's Estate for the benefit of all the Debtor's creditors.

(vi)     *Final Hearing*. The Debtor will seek approval of the relief requested in the Motion on a final basis pursuant to a final order ("Final Order") at a final hearing ("Final Hearing").

Based upon the foregoing, and after due consideration and good cause appearing therefor,

**IT IS HEREBY ADJUDGED, ORDERED, AND DECREED THAT:**

---

may    be    carried    forward    and    credited    to    subsequent    Variance    Testing    Periods.

6607907.1

4

**Section 1.** **Authorization and Conditions to Financing.**

1.1 <u>Motion Granted</u>. The Motion is granted on an interim basis to the extent provided in this Interim Order.

1.2 <u>Interim Authorization for Debtor to Use Loan Proceeds</u>. The Debtor is hereby authorized and empowered to immediately borrow and obtain loans and to incur indebtedness on an interim basis in accordance with the Budget, and obligations owing to Mr. Fowler pursuant to the terms and conditions of this Interim Order and the DIP Credit Agreement in such amounts as may be made available to the Debtor by Mr. Fowler in accordance with the DIP Credit Agreement, this Interim Order, and the Budget (subject to the Permitted Variances). The Debtor has delivered to Mr. Fowler and the Office of the United States Trustee an 8-week cashflow forecast of receipts and disbursements, and sources and uses of the Debtor, broken down by week, including the anticipated uses of post-petition financing for such period (a "<u>Budget</u>"), in each case, in form and substance acceptable to Mr. Fowler. The initial Budget is attached to this Interim Order as **<u>Exhibit B</u>**. Funds borrowed under the DIP Credit Agreement shall be used by the Debtor in accordance with the Budget (subject to the Permitted Variances), the DIP Credit Agreement and this Interim Order.

1.3 <u>Financing Agreement; Authorization</u>. The Debtor is hereby authorized and directed to enter into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the DIP Credit Agreement and this Interim Order.

1.4 <u>Payments and Application of Payments</u>. Subject to entry of a final order, the Debtor is authorized and directed to make all payments and transfers of Estate property to Mr. Fowler as provided, permitted and/or required under the DIP Credit Agreement and this Interim Order, which payments and transfers, subject to the terms herein, shall not be avoidable or

6607907.1

recoverable from Mr. Fowler under Section 547, 548, 550, 553 or any other Section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise. Such payments shall be applied by Mr. Fowler first to the Debtor's obligations until such obligations are paid and satisfied in full.

**Section 2.** **Post-petition Lien; Superpriority Administrative Claim Status**.

2.1 Post-Petition Lien.

2.1.1 Post-Petition Lien Granting. To secure the prompt payment and performance of any and all the Debtors' obligations under the DIP Credit Agreement (the "Post-Petition Obligations"), Mr. Fowler shall have and is hereby granted on an interim basis, effective as of the Petition Date, valid and perfected, security interests and liens, superior to all other liens, claims or security interests that any creditor of the Debtor's Estate may have (but subject to certain claims entitled to priority, including the Permitted Liens and Claims (defined below) as and to the extent expressly provided below), in and upon the Debtor's post-petition assets ("Post-Petition Collateral").

2.1.2 Lien Priority. The post-petition liens and security interests of Mr. Fowler granted under the DIP Credit Agreement and this Interim Order in the Post-Petition Collateral shall be and shall continue to be priming first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, in conjunction with Sections 363, 364 or any other Section of the Bankruptcy Code or other applicable law; provided, however, that Mr. Fowler's liens on and security interests in the Post-Petition Collateral shall be subject only to the Carve Out Expenses (as defined below) solely to the extent provided for in this Interim Order ("Permitted Liens and Claims").

2.1.3 Post-Petition Lien Perfection. This Interim Order shall be sufficient

6607907.1

6

and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Post-Petition Collateral, or other act to validate or perfect such security interest or lien (a "Perfection Act"). Notwithstanding the foregoing, if Mr. Fowler shall, in his sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, Mr. Fowler is authorized to perform such act, and the Debtor is authorized and directed to perform such act to the extent necessary or required by Mr. Fowler, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. Mr. Fowler may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law. Should Mr. Fowler so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.2     Superpriority Administrative Expense. For all Debtor's Post-Petition Obligations, Mr. Fowler is granted, on an interim basis, an allowed superpriority administrative claim pursuant to Section 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of the Debtor, whether now in

6607907.1

existence or hereafter incurred by the Debtor, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, *inter alia*, Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726 or 1114 of the Bankruptcy Code (the "Superpriority Claim"), provided, however, the Superpriority Claim shall be subject to the Permitted Liens and Claims as and to the extent expressly set forth in this Interim Order.

2.3     Carve Out Expenses.

2.3.1   Carve Out Expenses. Upon the declaration by Mr. Fowler of the occurrence of an Event of Default, Mr. Fowler's claims and security interests in the Post-Petition Collateral and its Superpriority Claim shall be subject only to the right of payment of the following expenses (the "Carve Out Expenses"):

a.     statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6); and

b.     fees payable to the Clerk of this Court.

2.4     Payment of Carve-Out Expenses. Prior to the occurrence of an Event of Default, the Debtor shall be permitted to pay any outstanding Carve-Out Expenses.

2.5     Use of Cash Collateral. Subject to the terms and conditions of this Interim Order and the DIP Credit Agreement, the Debtor shall be and is hereby authorized to use, until the expiration of Mr. Fowler's commitment to lend under the DIP Credit Agreement, the Cash Collateral (as defined in Section 363 of the Bankruptcy Code). Nothing in this Interim Order shall authorize the disposition of any assets of the Debtor or its Estate outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim Order, the DIP Credit Agreement, or any other order of the Court permitting such use.

6607907.1

**Section 3.** **Default; Rights and Remedies; Relief from Stay.**

3.1 Events of Default. The occurrence of any of the following events shall constitute an "Event of Default" under this Interim Order:

a. Debtor's failure to perform, in any respect, any of the terms, conditions or covenants, or its obligations, under this Interim Order; or

b. An "Event of Default" under the DIP Credit Agreement.

3.2 Rights and Remedies Upon Event of Default. Upon the occurrence of and during the continuance of an Event of Default, upon five (5) business day's prior written notice of such occurrence and continuation, in each case given to the Debtor and its counsel and the Office of the United States Trustee, Mr. Fowler shall be entitled to seek relief from the Court (which may be on an expedited basis) to exercise any right or remedy as provided in this Interim Order including, without limitation, declaring all obligations of the Debtor immediately due and payable, accelerating the obligations of the Debtor, ceasing to extend loans, setting off any obligations of the Debtor with Post-Petition Collateral or proceeds in Mr. Fowler's possession, and enforcing any and all rights with respect to the Post-Petition Collateral.

3.3 Expiration of Commitment. Upon the expiration of Debtor's authority to borrow and obtain other credit accommodations from Mr. Fowler pursuant to the terms of this Interim Order and the DIP Credit Agreement (except if such authority shall be extended with the prior written consent of Mr. Fowler, which consent shall not be implied or construed from any action, inaction or acquiescence by Mr. Fowler), unless an Event of Default set forth herein occurs sooner and the automatic stay has been lifted or modified pursuant to this Interim Order, all of the obligations of the Debtor shall immediately become due and payable.

6607907.1

9

**Section 4.**    **Other Rights and Obligations.**

4.1    No Modification or Stay of This Interim Order. In accordance with Section 364(e) of the Bankruptcy Code, and notwithstanding any modification, amendment or vacatur of any or all of the provisions of this Interim Order by a subsequent order of this Court or any other court, Mr. Fowler, in his capacity as DIP Lender, is entitled to the protections provided in Section 364(e) of the Bankruptcy Code, provided, however, that nothing in this Interim Order shall be construed as making a finding under Section 363(m) of the Bankruptcy Code.

4.2    Power to Waive Rights; Duties to Third Parties. Mr. Fowler shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of Mr. Fowler (the "Lender Rights") and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any Lender Right(s).  Any waiver by Mr. Fowler of any Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any Lender Right shall neither constitute a waiver of such Lender Right, subject Mr. Fowler to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtor to Mr. Fowler.

4.3    Reservation of Rights. The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of Mr. Fowler to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Credit Agreement or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Post-Petition Collateral or priority in favor of any other party, to object to any sale of assets, and to

6607907.1

10

object to applications for allowance and/or payment of compensation of the Debtor's professionals or other parties seeking compensation or reimbursement from the Estate.

4.4 Binding Effect. Subject to entry of a final order:

4.4.1 The provisions of this Interim Order and the DIP Credit Agreement, the Post-Petition Obligations, the Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of Mr. Fowler provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, subject to entry of a final order approving the DIP Credit Agreement, including without limitation any order which may be entered confirming any plan of reorganization, converting the case to any other chapter under the Bankruptcy Code, or dismissing the case.

4.4.2 Any order dismissing the case under Section 1112 of the Bankruptcy Code or otherwise shall be deemed to provide (in accordance with Sections 105 and 349 of the Bankruptcy Code) that: (a) the Superpriority Claim and Mr. Fowler's liens on and security interests in the Post-Petition Collateral shall continue in full force and effect notwithstanding such dismissal until the obligations of the Debtor are indefeasibly paid and satisfied in full; and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing the Superpriority Claim and liens in the Post-Petition Collateral.

4.4.3 This Interim Order shall be binding upon the Debtor, all parties in interest in the case and their respective successors and assigns, including any trustee or other fiduciary appointed in the case or any subsequently converted bankruptcy case(s) of the Debtor. This Interim Order shall also inure to the benefit of Mr. Fowler, the Debtor and their respective

successors and assigns.

4.5     [Reserved].

4.6     Term; Termination. Notwithstanding any provision of this Interim Order to the contrary, the term of the financing arrangements among the Debtor and Mr. Fowler authorized by this Interim Order may be terminated by Mr. Fowler upon the occurrence of an Event of Default.

4.7     Limited Effect. In the event of a conflict between the terms and provisions of the DIP Credit Agreement and this Interim Order, the terms and provisions of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Credit Agreement.

4.8     Adequate Notice. The Debtor shall promptly mail copies of this Interim Order to any known party affected by the terms of this Interim Order and any other party requesting notice after the entry of this Interim Order. Any objection to the relief sought at the Final Hearing shall be made in writing setting forth with particularity the grounds thereof, and filed with the Court and served so as to be actually received no later than seven (7) days prior to the Final Hearing by the following: (a) counsel to the Debtor, Tydings & Rosenberg LLP, One East Pratt Street, Suite 901, Baltimore, MD 21202, Attn:, Richard L. Costella, and Dennis J. Shaffer; (b) Kurt Fowler as debtor in possession lender, 171 Skipjack Road, Prince Frederick, Maryland, 20678; and (c) the Office of the United States Trustee, 6305 Ivy Lane, Greenbelt, Maryland 20770, Attn: Jeanette Rice (jeanette.rice@usdoj.gov). The Court shall conduct a Final Hearing on the Motion on the date provided by the Court as may be referenced on the first page of this Interim Order and/or as may be provided by separate notice.

4.9     Retention of Jurisdiction. This Court shall retain jurisdiction over all matters pertaining to the implementation, interpretation, and enforcement of this Interim Order.

6607907.1

13

**\*\*END OF ORDER\*\***


cc:    Richard L. Costella
Dennis J. Shaffer
Tydings & Rosenberg LLP
One East Pratt Street, Suite 901
Baltimore, Maryland  21202

Office of the United States Trustee
101 West Lombard Street, Suite 2625
Baltimore, Maryland 21201

Parties receiving notice by CM/ECF

6607907.1

# Exhibit A

## DEBTOR IN POSSESSION SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (the "Agreement") is made effective as of the _____ day of July, 2026 by and between **MULFORD CONSTRUCTION COMPANY, INC.**, a Maryland corporation, debtor and debtor in possession (the "Obligor") and **KURT FOWLER** (the "Lender").

### RECITALS

R-1.    On March 27, 2026 (the "Petition Date"), the Obligor filed a voluntary petition under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").

R-2.    The Obligor has requested that Lender provide loan in the original principal amount of $400,000.00 (the "Loan").

R-3.    The Lender is only willing to make the Loan to the Obligor upon the terms and subject to the conditions hereinafter set forth.

## I.    AGREEMENTS

NOW, THEREFORE, in consideration of the premises, the mutual agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Obligor and the Lender hereby agree as follows:

## II.    BORROWING

The Lender agrees to lend to the Obligor and the Obligor agrees to borrow from the Lender the Loan.  The obligation of the Obligor to repay the Loan shall be evidenced by the Obligor's Secured Promissory Note of even date herewith (the "Note") payable to the Lender's order.  The Note shall bear interest and shall be repaid by the Obligor in the manner and at the times set forth in the Note.

## III.    THE FINANCING DOCUMENTS

This Agreement, the Note, and any other instrument, agreement or document previously, simultaneously or hereafter executed and delivered by the Obligor, evidencing, guarantying or securing the Obligations, this Agreement, or the Note are sometimes referred to herein collectively as the "Financing Documents".

## IV.    DEFINITIONS

As used in this Agreement, the terms defined in the Preamble and Recitals hereto shall have the respective meanings specified therein, and the following terms shall have the following meanings:

"Account" individually and "Accounts" collectively mean all presently existing or hereafter acquired or created accounts, accounts receivable, contract rights, notes, drafts,

6608004.3                                                                              1

instruments, acceptances, chattel paper, leases and writings evidencing a monetary obligation or a security interest in or a lease of goods, all rights to receive the payment of money or other consideration under present or future contracts (including, without limitation, all rights to receive payments under presently existing or hereafter acquired or created letters of credit), or by virtue of merchandise sold or leased, services rendered, loans and advances made or other considerations given, by or set forth in or arising out of any present or future chattel paper, note, draft, lease, acceptance, writing, bond, insurance policy, instrument, document or general intangible, and all extensions and renewals of any thereof, all rights under or arising out of present or future contracts, agreements or general interest in merchandise which gave rise to any or all of the foregoing, including all goods, all claims or causes of action now existing or hereafter arising in connection with or under any agreement or document or by operation of law or otherwise, all collateral security of any kind (including real property mortgages) given by any person with respect to any of the foregoing and all proceeds (cash and non-cash) of the foregoing; provided, however, that an Account shall not include any account for services rendered to a Medicare or Medicaid beneficiary to the extent any law or regulation prohibits the assignment of any such account.

"Business Day" shall mean any day that is not a Saturday, Sunday or banking holiday in the State of Maryland.

"Documents" means all documents and documents of title, whether nor existing or hereafter acquired or created, and all proceeds (cash and non-cash of the foregoing).

"Equipment" means all equipment, machinery, furniture and fixtures and supplies of every nature, presently existing or hereafter acquired or created and wherever located, together with all accessions, additions, fittings, accessories, special tools, and improvements thereto and substitutions therefor and all parts and equipment which may be attached to or which are necessary for the operation and use of such personal property, whether or not the same shall be deemed to be affixed to real property, and all rights under or arising out of present or future contracts relating to the foregoing and all proceeds (cash and non-cash) of the foregoing.

"General Intangibles" shall mean all general intangibles of every nature, whether presently existing or hereafter acquired or created, including without limitation all books, correspondence, credit files, records, computer programs, computer tapes, cards and other papers and documents in the possession or control of the Obligor, claims (including without limitation all claims for income tax and other refunds), choses in action, contract rights, judgments, patents, patent licenses, trademarks, trademark licenses, licensing agreements, rights in intellectual property, goodwill (including all goodwill of the Obligor's business symbolized by and associated with any and all trademarks, trademark licenses, copyrights and/or service marks), royalty payments, contractual rights, rights as lessee under any lease of real or personal property, literary rights, copyrights, service names, service marks, logos, trade secrets, all amounts received as an award in or settlement of a suit in damages, deposit accounts, interests in joint ventures or general or limited partnerships, rights in applications for any of the foregoing, and all proceeds (cash and non-cash) of the foregoing.

"Inventory" means all inventory of the Obligor, including, without limitation all packing, shipping, advertising, and promotional materials, and all documents of title or documents representing the same, all general intangibles necessary or beneficial for the disposition of the same, and all proceeds (cash and non-cash) of the foregoing.

6608004.3                                                          2

"Person" shall include natural persons, corporations (which shall be deemed to include business trusts), associations, companies, partnerships, limited liability companies and joint ventures.

## V.  COLLATERAL

As security for the payment of all of the obligations evidenced by the Financing Documents and for the Obligor's performance of, and compliance with, all of the terms, covenants, conditions, stipulations and agreements contained in the Financing Documents (collectively, the "Obligations"), the Obligor hereby grant to the Lender and agree that the Lender shall have a perfected, continuing security interest in all of the following post-petition property and assets of the Obligor, wherever situated (the "Collateral"):

(a)  All Inventory;

(b)  All Accounts;

(c)  All Equipment;

(d)  All General Intangibles; and

all proceeds (cash and non-cash) and products thereof, and all returned, rejected or repossessed goods, the sale or lease of which shall have given or shall give rise to an Account and all cash and non-cash proceeds and products of all such goods.  The Obligor further agree that the Lender shall have in respect thereof all of the rights and remedies of a secured party under the Maryland Uniform Commercial Code as well as those provided in this Agreement.  The Obligor covenant and agrees that Lender may prepare and file such financing statements and other instruments and filings as are necessary in the opinion of the Lender to perfect such security interest. Notwithstanding the fact that the proceeds of the Collateral constitute a part of the Collateral, the Obligor may not dispose of the Collateral, or any part thereof, other than in the ordinary course of its business or as otherwise may be permitted by this Agreement.

## VI.  UNCONDITIONAL OBLIGATIONS

The payment and performance by the Obligor of the Obligations shall be absolute and unconditional, irrespective of any defense or any rights of set-off, recoupment or counterclaim it might otherwise have against the Lender and the Obligor shall pay absolutely net all of the Obligations, free of any deductions and without abatement, diminution or set-off; and until payment in full of all of the Obligations, the Obligor: (a) will not suspend or discontinue any payments provided for in the Note and (b) will perform and observe all of its other agreements contained in this Agreement, including (without limitation) all payments required to be made to the Lender.

## VII.  AFFIRMATIVE COVENANTS OF OBLIGOR

Until payment in full and the performance of all of the Obligations hereunder, the Obligor shall:

Section 7.1     Existence.  With respect to the Obligor, maintain its corporate existence in good standing in the jurisdiction in which it was organized and in each jurisdiction where it is required to register or qualify to do business.

Section 7.2     Compliance with Laws.  Comply with all applicable federal, state and local laws, rules and regulations to which it is subject and the violation of which would have a material adverse effect on the conduct of its business.

Section 7.3     Insurance Generally.  Obligor will maintain commercial general liability insurance and "special form" casualty insurance on the Collateral against such risks, in such amounts, with such loss deductible amounts and with such companies as is customary in the same or a similar business, as long as the same remains commercially available.  Without limiting the generality of the foregoing, such insurance must provide that it may not be canceled without thirty (30) days prior written notice to Lender.  The Obligor shall cause Lender to be endorsed as a loss payee, as its interest may appear, on the casualty insurance, and to be named as a loss payee on the commercial general liability insurance.  Prior to an Event of Default, all sums payable under such policy or policies covering physical damage to the Collateral shall be paid to Obligor and shall be used solely for the repair, restoration and replacement of the damaged or disturbed Collateral; provided, however, that if an Event of Default has occurred and is continuing, then all proceeds shall be paid to Lender and Lender shall have the option to allow application of the net proceeds either toward replacing or restoring the Collateral, in a manner and on terms satisfactory to Lender, or as a credit against such of the Obligations, whether matured or unmatured, as Lender shall determine in Lender's sole discretion, in which event Obligor shall cause such insurance proceeds to be delivered to Lender or if such proceeds have been received by Obligor, then Obligor shall immediately be delivered to Lender.  Obligor shall not compromise or adjust any loss, without the prior written consent of Lender, which consent shall not be unreasonably withheld.

Section 7.4     Maintenance of the Collateral.  Not knowingly or intentionally permit anything to be done to the Collateral which may impair the value thereof.  Upon prior written notice to Obligor, the Lender, or an agent designated by the Lender, shall be permitted to enter the premises of the Obligor and examine, audit and inspect the Collateral at any reasonable time and from time to time.  Prior to an Event of Default, such inspections shall be at Lender's sole cost and expense.  After the occurrence of an Event of Default and during the period that such Event of Default remains uncured, such inspections shall be at the Obligor's cost and expense.  The Lender shall not have any duty to, and the Obligor hereby release the Lender from all claims of loss or damage caused by the delay or failure to collect or enforce any of the Accounts or to, preserve any rights against any other party with an interest in the Collateral.

Section 7.5     Other Liens, Security Interests, etc.  Keep the Collateral free from all liens, security interests and claims of every kind and nature, other the security interest granted to the Lender pursuant to this Agreement.  Lender agrees to, from time to time, execute such documents as the permitted lienholders described in the Section shall reasonably require to evidence and confirm such subordination.

Section 7.6     Defense of Title and Further Assurances.  At its expense defend the title to the Collateral (or any part thereof), and promptly upon reasonable request execute, acknowledge and deliver any financing statement, renewal, affidavit, deed, assignment, continuation statement, security agreement, certificate or other document the Lender may require in order to perfect,

preserve, maintain, protect, continue and/or extend the lien or security interest granted to the Lender under this Agreement and its priority. The Obligor shall pay to the Lender on demand all taxes, actual costs and expenses incurred by the Lender in connection with the preparation, execution, recording and filing of any such document or instrument.

Section 7.7. <u>Books and Records</u>. Keep and maintain proper and current books and records in accordance with federal income tax accounting principles and permit access by Lender to, reproduction by Lender of and copying by Lender from, such books and records during normal business hours.

## VIII. <u>NEGATIVE COVENANTS OF OBLIGOR</u>

Until payment in full and the performance of all of the Obligations, without the prior written consent of the Lender, the Obligor will not directly or indirectly:

Section 8.1 <u>Transfer of Collateral</u>. Transfer, or permit the transfer, to another location of any of the Collateral or the books and records related to any of the Collateral; provided, however, that the Obligor may transfer the Collateral or the books and records related thereto to another location if the Obligor shall have provided to the Lender prior to such transfer an opinion of counsel addressed to the Lender to the effect that the Lender's perfected security interest shall not be affected by such move or if it shall be affected, setting forth the steps necessary to continue the Lender's perfected security interest together with the commencement of such steps by the Obligor at their expense.

Section 8.2 <u>Sale and Leaseback</u>. Directly or indirectly enter into any arrangement to sell or transfer all or any substantial part of its fixed assets then owned by it and thereupon or within one year thereafter rent or lease the assets so sold or transferred.

Section 8.3 <u>Sale of Accounts</u>. Sell, discount, transfer, assign or otherwise dispose of any of its Accounts, notes receivable, installment or conditional sales agreements or any other rights to receive income, revenues or moneys, however evidenced.

## IX. <u>EVENTS OF DEFAULT</u>

The occurrence of one or more of the following events shall be "Events of Default" under this Agreement, and the terms "Event of Default" or "default" shall mean, whenever they are used in this Agreement, any one or more of the following events:

Section 9.1 <u>Events under Financing Documents</u>. The occurrence of any Event of Default, as defined in the Financing Documents, after the expiration of all applicable notice or cure periods, if any. If no cure period is expressly set forth or specifically limited with respect to an non-monetary Event of Default, then the Obligor shall have fifteen (15) days after Lender's notice to Obligor of the occurrence of the default which would constitute an Event of Default if left uncured, in which to cure the default, provided there shall be no cure period for an Event of Default under Section 8.2 hereof.

Section 9.2　Failure to Pay. The Obligor shall fail to (a) make any payment of principal or interest on the Note or (b) pay any of the Obligations, when and as the same shall become due and payable after the expiration of any applicable notice and cure period.

Section 9.3　Breach of Representations and Warranties. Any representation or warranty made herein or in any report, certificate, opinion (including any opinion of counsel for the Obligor), financial statement or other instrument furnished in connection with the Obligations or with the execution and delivery of any of the Financing Documents, shall prove to have been false or misleading when made in any material respect.

Section 9.4　Failure to Comply with Covenants. Default shall be made by the Obligor in the due observance and performance of any covenant, condition or agreement contained in the Financing Documents, and such default shall continue after the expiration of any applicable notice and cure period.

Section 9.5　Receiver; Bankruptcy. The Obligor shall (a) apply for or consent to the appointment of a receiver, trustee or liquidator of itself or any of its property, (b) admit in writing its inability to pay its debts as they mature, (c) make a general assignment for the benefit of Lenders, (d) be adjudicated a bankrupt or insolvent, (e) file a voluntary petition in bankruptcy or a petition or an answer seeking reorganization or an arrangement with Lenders or to take advantage of any bankruptcy, reorganization, insolvency, readjustment of debt, dissolution or liquidation law or statute, or an answer admitting the material allegations of a petition filed against it in any proceeding under any such law or if corporate action shall be taken by either of the Obligor for the purposes of effecting any of the foregoing, **with the exception of Bankruptcy Case No. 26-13271 (LSS), pending in the United States Bankruptcy Court for the District of Maryland**, or (f) by any act indicate its consent to, approval of or acquiescence in any such proceeding or the appointment of any receiver of or trustee for any of its property, or suffer any such receivership, trusteeship or proceeding to continue undischarged for a period of sixty (60) days.

## X.　RIGHTS AND REMEDIES UPON DEFAULT

Section 10.1　Demand; Acceleration. The occurrence or non-occurrence of an Event of Default under this Agreement shall in no way affect or condition the right of the Lender to demand payment at any time of any of the Obligations which are payable on demand regardless of whether or not an Event of Default has occurred. Upon the occurrence of an Event of Default, and in every such event and at any time thereafter, the Lender may declare the Obligations due and payable, without presentment, demand, protest, or any notice of any kind, all of which are hereby expressly waived, anything contained herein or in any of the other Financing Documents to the contrary notwithstanding.

Section 10.2　Specific Rights with Regard to Collateral. In addition to all other rights and remedies provided hereunder or as shall exist at law or in equity from time to time, the Lender may, without notice to the Obligor:

(a)　upon an Event of Default, request any account debtor obligated on any of the Accounts to make payments thereon directly to the Lender, with the Lender taking control of the cash and non-cash proceeds thereof;

6608004.3　　　　　　　　　　　　　　　　　6

(b)      upon an Event of Default, compromise, extend or renew any of the Collateral or deal with the same as it may deem advisable;

(c)      upon an Event of Default, make exchanges, substitutions or surrenders of all or any part of the Collateral;

(d)      upon an Event of Default, remove from any of the Obligor's place of business all books, records, ledger sheets, correspondence, invoices and documents, relating to or evidencing any of the Collateral or without cost or expense to the Lender, make such use of the Obligor's place(s) of business as may be reasonably necessary to administer, control and collect the Collateral;

(e)      demand, collect, receipt for and give renewals, extensions, discharges and releases of any of the Collateral;

(f)      upon an Event of Default, institute and prosecute legal and equitable proceedings to enforce collection of, or realize upon, any of the Collateral;

(g)      settle, renew, extend, compromise, compound, exchange or adjust claims in respect of any of the Collateral or any legal proceedings brought in respect thereof; and

(h)      upon an Event of Default, endorse the name of the Obligor upon any items of payment relating to the Collateral or on any Proof of Claim in Bankruptcy against an account debtor.

Section 10.3   <u>Performance by Lender</u>.  If the Obligor fail to pay the Obligations or otherwise fail to perform, observe or comply with any of the conditions, covenants, terms, stipulations or agreements contained in this Agreement or any of the other Financing Documents, the Lender without notice to or demand upon the Obligor and without waiving or releasing any of the Obligations or any Event of Default, may (but shall be under no obligation to) at any time thereafter make such payment or perform such act for the account and at the expense of the Obligor, and may enter upon the premises of the Obligor for that purpose and take all such action thereon as the Lender may consider necessary or appropriate for such purpose.  All sums so paid or advanced by the Lender and all costs and expenses (including, without limitation, reasonable attorneys' fees and expenses) incurred in connection therewith (the "Expense Payments") together with interest thereon from the date of payment, advance or incurring until paid in full at the default shall be paid by the Obligor to the Lender on demand and shall constitute and become a part of the Obligations.

Section 10.4   <u>Uniform Commercial Code and Other Remedies</u>.

(a)      Upon the occurrence of an Event of Default (and in addition to all of its rights, powers and remedies under this Agreement), the Lender shall have all of the rights and remedies of a secured party under the Maryland Uniform Commercial Code and other applicable laws, and the Lender is authorized to offset and apply to all or any part of the Obligations all moneys, credits and other property of any nature whatsoever of the Obligor now or at any time hereafter in the possession of, in transit to or from, under the control or custody of, or on deposit with, the Lender.  Upon demand by the Lender, the Obligor shall assemble the Collateral and make

6608004.3                                                              7

it available to the Lender, at a place designated by the Lender.  The Lender or its agents may enter upon the Obligor's premises to take possession of the Collateral, to remove it, to render it unusable, or to sell or otherwise dispose of it.

(b)     Any written notice of the sale, disposition or other intended action by the Lender with respect to the Collateral which is sent by regular mail, postage prepaid, to the Obligor at the address set forth in Part X hereof, or such other address of the Obligor which may from time to time be shown on the Lender's records, at least ten (10) days prior to such sale, disposition or other action, shall constitute reasonable notice to the Obligor.  The Obligor shall pay on demand all costs and expenses, including, without limitation, reasonable attorney's fees and expenses, incurred by or on behalf of the Lender in preparing for sale or other disposition, selling, managing, collecting or otherwise disposing of, the Collateral.  All of such costs and expenses (the "Liquidation Costs") together with interest thereon from the date incurred until paid in full at the default interest rate set forth in the Note, shall be paid by the Obligor to the Lender on demand and shall constitute and become a part of the Obligations.  Any proceeds of sale or other disposition of the Collateral will be applied by the Lender to the payment of the Liquidation Costs and Expense Payments, and any balance of such proceeds will be applied by the Lender to the payment of the balance of the Obligations in such order and manner of application as the Lender may from time to time in its sole discretion determine.  After such application of the proceeds, any balance shall be paid to the Obligor or to any other party entitled thereto.

## XI.    MISCELLANEOUS

Section 11.1   Notices.  All notices, certificates or other communications hereunder shall be deemed to have been received when delivered by hand, on the next business day after being delivered to an overnight courier, or on the second business day after being deposited in the mail by first class, registered or certified mail, return receipt requested, postage prepaid, addressed as follows:

if to the Lender:

if to the Obligor:

With a copy to:
Richard L. Costella
c/o Tydings & Rosenberg LLP
1 East Pratt Street, Suite 901
Baltimore, MD 21202

Section 11.2   Consents and Approvals.  If any consent, approval, or authorization of any state, municipal or other governmental department, agency or authority or of any person, or any person, corporation, partnership or other entity having any interest therein, should be necessary to effectuate any sale or other disposition of the Collateral, the Obligor agree to execute all such applications and other instruments, and to take all other action, as may be required in connection with securing any such consent, approval or authorization.

Section 11.3    Remedies, etc. Cumulative.  Each right, power and remedy of the Lender as provided for in this Agreement or in any of the other Financing Documents or now or hereafter existing at law or in equity or by statute or otherwise shall be cumulative and concurrent and shall be in addition to every other right, power or remedy provided for in this Agreement or in any of the other Financing Documents or now or hereafter existing at law or in equity, by statute or otherwise, and the exercise or beginning of the exercise by the Lender of any one or more of such rights, powers or remedies shall not preclude the simultaneous or later exercise by the Lender of any or all such other rights, powers or remedies.  In order to entitle the Lender to exercise any remedy reserved to it herein, it shall not be necessary to give any notice, other than such notice as may be expressly required in this Agreement.

Section 11.4    No Waiver of Rights by the Lender.  No failure or delay by the Lender to insist upon the strict performance of any term, condition, covenant or agreement of this Agreement or of any of the other Financing Documents, or to exercise any right, power or remedy consequent upon a breach thereof, shall constitute a waiver of any such term, condition, covenant or agreement or of any such breach or preclude the Lender from exercising any such right, power or remedy at any later time or times.  By accepting payment after the due date of any amount payable under this Agreement or under any of the other Financing Documents, the Lender shall not be deemed to waive the right either to require prompt payment when due of all other amounts payable under this Agreement or under any of the other Financing Documents, or to declare a default for failure to effect such prompt payment of any such other amount.

Section 11.5    Entire Agreement.  The Financing Documents shall completely and fully supersede all other agreements, both written and oral, between the Lender and the Obligor relating to the Obligations.  Neither the Lender nor the Obligor shall hereafter have any rights under such prior agreements but shall look solely to the Financing Documents for definition and determination of all of their respective rights, liabilities and responsibilities relating to the Obligations.

Section 11.6    Survival of Agreement; Successors and Assigns.    All covenants, agreements, representations and warranties made by the Obligor herein and in any certificate, in the Financing Documents and in any other instruments or documents delivered pursuant hereto shall survive the making by the Lender of the Loan and the execution and delivery of the Note, and shall continue in full force and effect so long as any of the Obligations are outstanding and unpaid.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the successors and assigns of such party; and all covenants, promises and agreements by or on behalf of the Obligor, which are contained in this Agreement shall inure to the benefit of the successors and assigns of the Lender, and all covenants, promises and agreements by or on behalf of the Lender which are contained in this Agreement shall inure to the benefit of the permitted successors and permitted assigns of the Obligor, but this Agreement may not be assigned by the Obligor without the prior written consent of the Lender.

Section 11.7    Expenses.  The Obligor agrees to reimburse the Lender upon demand for all out-of-pocket expenses (including reasonable attorneys' fees and legal expenses) incurred by the Lender in enforcing any of the Obligations or any security therefor, which agreement shall survive the termination of this Agreement and the repayment of the Obligations.

Section 11.8  <u>Counterparts</u>.  This Agreement may be executed in any number of counterparts all of which together shall constitute a single instrument.  Signatures transmitted electronically or by facsimile shall constitute original signatures hereto.

Section 11.9  <u>Governing Law</u>.  This Agreement and all of the other Financing Documents shall be governed by and construed in accordance with the laws of the state of Maryland.

Section 11.10  <u>Modifications</u>.  No modification or waiver of any provision of this Agreement or of any of the other Financing Documents, nor consent to any departure by the Obligor therefrom, shall in any event be effective unless the same shall be in writing, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  No notice to or demand on the Obligor in any case shall entitle the Obligor to any other or further notice or demand in the same, similar or other circumstance.

Section 11.11  <u>Illegality</u>.  If fulfillment of any provision hereof or any transaction related hereto or to any of the other Financing Documents, at the time performance of such provision shall be due, shall involve transcending the limit of validity prescribed by law, then <u>ipso</u> <u>facto</u>, the obligation to be fulfilled shall be reduced to the limit of such validity; and if any clause or provisions herein contained other than the provisions hereof pertaining to repayment of the Obligations operates or would prospectively operate to invalidate this Agreement in whole or in part, then such clause or provision only shall be void, as though not herein contained, and the remainder of this Agreement shall remain operative and in full force and effect; and if such provision pertains to repayment of the Obligations, then, at the option of the Lender, all of the Obligations of the Obligor to the Lender shall become immediately due and payable.

Section 11.12  <u>Extension of Maturity</u>.  Should the principal of or interest on the Note become due and payable on other than a Business Day, the maturity thereof shall be extended to the next succeeding Business Day and in the case of principal, interest shall be payable thereon at the rate per annum specified in the Note during such extension.

Section 11.13  <u>Gender, etc.</u>  Whenever used herein, the singular number shall include the plural, the plural the singular and the use of the masculine, feminine or neuter gender shall include all genders.

Section 11.14  <u>Headings</u>.  The headings in this Agreement are for convenience only and shall not limit or otherwise affect any of the terms hereof.

**Section 11.15  <u>Waiver of Trial by Jury</u>.  The parties hereto hereby waive trial by jury in any action or proceeding to which both of them may be parties, arising out of or in any way pertaining to (a) this Agreement, (b) the Loan, Obligations, and Collateral which are the subject of this Agreement, and (c) any and all notes, guarantees, assignments or agreements of any kind relating to the Loan.  It is agreed and understood that this waiver constitutes a waiver of trial by jury of all claims against all parties to such actions or proceedings, including claims against parties who are not parties to this Agreement.**

**This waiver is knowingly, willingly and voluntarily made by each of the parties hereto, and the parties hereby represent that no representations of fact or opinion have been made by any individual to induce this waiver of trial by jury or to in any way modify or nullify its effect.  The parties further represent that they have been represented in the signing of this Agreement and in the making of this waiver by independent legal counsel, selected of their own free will, and that they have had the opportunity to discuss this waiver with counsel.**

[Signatures and acknowledgements commence on next page]

6608004.3

11

IN WITNESS WHEREOF, the parties hereto have signed and sealed this Agreement as of the day and year first above written.

**OBLIGOR:**

**MULFORD CONSTRUCTION COMPANY, INC.,** a Maryland corporation

By: _____ (SEAL)
Name:
Title:

**LENDER:**

_____ [SEAL]
Kurt Fowler

6608004.3

12

**$400,000.00**                                              **Baltimore, MD**
                                                            **July __, 2026**

### DEBTOR IN POSSESSION SECURED PROMISSORY NOTE

**FOR VALUE RECEIVED**, the undersigned **MULFORD CONSTRUCTION COMPANY, INC.**, a Maryland corporation, **DEBTOR AND DEBTOR IN POSSESSION** (the "Maker"), promise to pay to the order of KURT FOWLER (collectively, together with all subsequent holders of this Note, called the "Payee"), at the Payee's offices at 171 Skipjack Rd, Prince Frederick, Maryland, 20678, or at such other place as the holder of this Secured Promissory Note may from time to time designate, the principal sum of **Four Hundred Thousand Dollars ($400,000.00)**, or so much thereof as may be advanced from time to time (the "Principal Sum"), together with interest thereon at the rate hereafter specified and any and all other sums which may be owing to the holder of this Secured Promissory Note (this "Note") by the Maker, on or before December 31, 2026 (the "Maturity Date"), which is the final and absolute due date of this Note. The following terms shall apply to this Note:

1.      Security. This Note is secured by a Security Agreement (the "Security Agreement") of even date herewith between Maker and Payee, providing a security interest in certain tangible and intangible personal property, more specifically described in the said Security Agreement. The Security Agreement and any financing statements or other documents executed in connection therewith are sometimes herein referred to as the "Security Documents." The holder hereof is entitled to the benefits of the collateral and security described in the Security Documents and may enforce the covenants of the Maker contained in this Note and may exercise the rights and remedies provided for by the Security Documents, all in accordance with the terms thereof and in this Note. Reference is hereby made to the Security Documents for the provisions upon which the maturity of this Note may be accelerated, the duties and obligations of the Maker and the rights and remedies of the holder hereof.

2.      Interest Rate. Interest shall accrue on the disbursed, unpaid principal balance of the loan at a rate of **Ten Percent (10%)** per annum.

3.      Repayment. Interest payments shall be payable monthly on the first day of each month, commencing on September 1, 2026 and continuing on the first day of each successive month thereafter until the Maturity Date. Payments of all unpaid principal, accrued interest and any other fees contemplated hereby shall be due and payable in full on the Maturity Date, or such earlier date if arising by acceleration.

4.      Application of Payments. All payments made hereunder, shall be applied first to late penalties or other sums owed to the holder, next to accrued interest, and then to principal, to the

1

6607750.4

extent permitted, or in such other order or proportion as the holder of this Note, in the holder's sole and absolute discretion, may elect.

5.  Late Payment Penalty.  Should any payment of interest or the Principal Sum due hereunder be received by the holder of this Note more than seven (7) calendar days after its due date, the Maker shall pay a late payment penalty equal to five percent (5%) of the amount then due.

6.  Voluntary Prepayment.  The Maker may prepay this Note in whole or in part at any time or from time to time without penalty or additional interest.

7.  Events of Default. An event of default under this Note (an "Event of Default") shall be deemed to exist upon the occurrence of any of the following: (1) failure to pay any principal, expenses, late charge or interest when due, or failure to perform any other obligations hereunder; (2) a default in any of the requirements of Maker under any Security Document; (3) conversion to Chapter 7 or dismissal of the Debtor's bankruptcy case, Case No. 26-13271 (LSS), pending in the United States Bankruptcy Court for the District of Maryland.

8.  Acceleration Upon Default.  Upon an Event of Default hereunder or under any of the Loan Documents, the unpaid balance of the principal sum hereof, with interest at the Penalty Rate, as herein defined, may be declared and may become immediately due and payable, at the option of Lender.

9.  Default Interest Rate.  Upon an Event of Default in the payment of any principal amount due under this Note, or under any other agreement between the Maker and the Payee, and unless and until cured, the holder may, without notice or demand, raise the rate of interest accruing on the disbursed unpaid principal balance **twelve percent (12%)** per annum, independent of whether the holder of this Note elects to accelerate the unpaid principal balance as a result of such default.

10.  Certain Post-Judgment Rights of Payee.  Maker acknowledges and agrees that Payee's right to collect the reasonable attorneys' fees it actually incurs, after the date of any judgment on any suit hereunder, in enforcing any of its rights or remedies hereunder or in protecting Payee's collateral or any interests of Payee therein, shall not be deemed to merge into any judgment awarded by the court, and shall survive any such judgment; it being the intention of the parties to this Note that Payee shall have the right to bring and maintain one or more post-judgment actions for reimbursement of all reasonable attorneys' fees actually incurred by Payee in obtaining full and final repayment of all indebtedness, liabilities and obligations evidenced or secured by this Note or the other Security Documents.  This Note and the indebtedness, liabilities and obligations of Maker hereunder shall be deemed to survive until the full and final repayment of all indebtedness, liabilities and obligations evidenced or secured by this Note.

2

6607750.4

11.     Waivers, Etc. Payee may, without notice to or the consent of Maker and without discharging, lessening or releasing in any way the liability hereunder of Maker, grant extensions or renewals hereof from time to time and for any term or terms.  The holder hereof shall not be liable or prejudiced by the failure to collect or for the lack of diligence in bringing suit on this Note or any renewal or extension hereof.  Any failure by the holder hereof to exercise any right or remedy hereunder or under applicable law shall not be construed as a waiver of the right to exercise the same at any time or from time to time thereafter.  Each right, power and remedy of the holder hereunder, under this Note and the Security Documents or under applicable laws shall be cumulative and concurrent, and the exercise of any one or more of them shall not preclude the simultaneous or later exercise by the holder of any of all such rights, powers or remedies.  By accepting payment after the due date of any amount payable under the terms of this Note, Payee shall not be deemed to waive the right to require prompt payment when due of all other amounts payable under the terms of this Note or to declare a default for the failure to effect such prompt payment of any such other amount. No course of dealing or conduct shall be effective to amend, modify, waive, release or change any provision of this Note.

12.     Interest Rate After Judgment.  If judgment is entered against the Maker on this Note, the amount of the judgment entered (which may include principal, interest, default interest, late charges, fees, and costs) shall bear interest at the highest rate authorized under this Note as of the date of entry of the judgment.

13.     Expenses of Collection.  Upon a default under this Note or any other Security Document between the Maker and the Payee, this Note may be referred to an attorney for collection.  If this Note is referred to an attorney for collection, the Maker shall pay all of the holder's costs, fees, and expenses resulting from such referral, including reasonable attorney's fees actually incurred, including but not limited to attorney's fees for any bankruptcy proceedings involving the Maker, even though judgment has not been confessed or suit has not been filed.

14.     Waiver of Defense.  In the event the holder of this Note transfers this Note for value, the Maker agrees that all subsequent holders of this Note shall not be subject to any claims or defenses which the Maker may have against a prior holder, all of which are waived as to the subsequent holder except to the extent that the subsequent holder has actual knowledge thereof, and that all subsequent holders shall have all the rights of a holder in due course with respect to the Maker even though the subsequent holder may not qualify, under applicable law, absent this paragraph, as a holder in due course.

15.     Waiver of Protest.  The Maker, and all parties to this Note, whether maker, endorser, or guarantor, waive presentment, notice of dishonor, notice of intention to accelerate the maturity hereof, notice of acceleration of the maturity hereof, and protest.

3

6607750.4

16. <u>Extensions of Maturity</u>.  All parties to this Note, whether maker, endorser, or guarantor, agree that the maturity of this Note, or any payment due hereunder, may be extended at any time or from time to time by the holder without releasing, discharging, or affecting the liability of such party.

17. <u>Commercial Loan</u>.  This loan was transacted solely for the purpose of carrying on or acquiring a business or commercial investment within the meaning of Sections 12-101 to 12-114 of the Commercial Law Article of the Annotated Code of Maryland and any additions or amendments thereto.

18. <u>Choice of Law</u>.  This Note shall be governed, construed, interpreted, enforced and its validity and enforceability determined in accordance with the laws of the State of Maryland.  The Maker consents to the jurisdiction of the courts of the State of Maryland and, if diversity of citizenship exists between the Maker and the holder and a sufficient amount is in controversy or if some other basis exists for the jurisdiction of the federal courts, to the jurisdiction of the United States District Court for the District of Maryland.

19. <u>Invalidity of Any Part</u>.  If any provision or part of any provision of this Note shall for any reason be held invalid, illegal or unenforceable in any respect, such invalidity or unenforceability shall not affect any other provision of this Note and this Note shall be construed as if such invalid, illegal or unenforceable provision or part thereof had never been contained herein, but only to the extent of its invalidity, illegality or unenforceability.

20. <u>Tense and Gender</u>.  As used herein, the term "Maker" includes the singular and the plural and refers to all genders.

21. <u>Assignability</u>.  This Note may be assigned by the Payee or any subsequent holder at any time and from time to time.

22. <u>Binding Nature</u>.  This Note shall inure to the benefit of and be enforceable by the Payee and the Payee's successors and assigns and any other person to whom the Payee may grant an interest in the Maker's obligations to the Payee, and shall be binding and enforceable against the Maker and the Maker's successors and assigns.

23. **<u>WAIVER OF JURY TRIAL</u>.  The undersigned and the Payee (by its acceptance of this Note) agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by the undersigned or any successor or assign of the undersigned on or with respect to this Note or any of the Security Documents which in any way relates, directly or indirectly, to the obligations of the undersigned to Payee under this  Note or any of the loan documents, or the dealings of the parties with respect thereto, SHALL BE TRIED ONLY BY**

4

6607750.4

**A COURT AND NOT BY A JURY.  The undersigned further agrees that in any suit, action or proceeding brought or instituted by Payee on or with respect to this  Note or any of the loan documents which in any way relates, directly or indirectly, to the obligations of the undersigned to Payee under this  Note or under any of the loan documents or the dealings of the parties with respect thereto, THE UNDERSIGNED SHALL NOT EXERCISE ANY RIGHTS THEY MAY HAVE TO ELECT OR DEMAND A TRIAL BY JURY.  THE UNDERSIGNED HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY in any such aforementioned suits, actions or proceedings, and acknowledges and agrees that this provision is a specific and material aspect of the agreement between the parties and that Payee would not enter into the transaction with the undersigned if this provision were not part of their agreement.**

IN WITNESS WHEREOF, this Note has been executed by the Maker under seal as of the date first set forth above.

**MULFORD CONSTRUCTION COMPANY, INC.,**

By:_____(SEAL)
Print Name:
Title:

5

6607750.4

# Exhibit B

Mulford Construction Corp.
Projected Cash Flow Model
July 24, 2026
All figures in $

| | Wk.1 31-Jul Proj. | Wk.2 7-Aug Proj. | Wk.3 14-Aug Proj. | Wk.4 21-Aug Proj. | Wk.5 28-Aug Proj. | Wk.6 4-Sep Proj. | Wk.7 11-Sep Proj. | Wk.8 18-Sep Proj. | Total Wk.1 - Wk.8 Proj. |
|---|---|---|---|---|---|---|---|---|---|
| **Cash Balance (Beg.)** | $ 14,725 | $ 203,253 | $ 204,497 | $ 460,526 | $ 555,851 | $ 611,176 | $ 986,352 | $ 1,026,177 | $ 14,725 |
| **Receipts** | | | | | | | | | |
| Customer Receipts | 511,613 | 31,567 | 531,113 | 150,000 | 225,000 | 300,000 | 300,000 | 300,000 | **2,349,292** |
| Other Receipts (Note 1) | - | - | - | 185,000 | | 350,000 | - | - | **535,000** |
| DIP Loan Proceeds | - | 400,000 | - | - | - | - | - | - | **400,000** |
| **Total Receipts** | **511,613** | **431,567** | **531,113** | **335,000** | **225,000** | **650,000** | **300,000** | **300,000** | **3,284,292** |
| **Disbursements** | | | | | | | | | |
| **Payroll, Benefits, and Other HR Expenses** | | | | | | | | | |
| Gross Payroll | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | (95,000) | **(760,000)** |
| Payroll Taxes | (34,675) | (34,675) | (34,675) | (34,675) | (34,675) | (34,675) | (34,675) | (34,675) | **(277,400)** |
| Benefit Payments - Healthcare | - | (8,000) | (2,908) | - | - | - | (8,000) | (26,908) | **(45,816)** |
| **Subtotal - Payroll, Benefits, and Other HR Expenses** | **(129,675)** | **(137,675)** | **(132,583)** | **(129,675)** | **(129,675)** | **(129,675)** | **(137,675)** | **(156,583)** | **(1,083,216)** |
| **Operating Disbursements** | | | | | | | | | |
| Materials | (20,000) | (20,000) | (22,500) | (15,000) | (22,500) | (22,500) | (22,500) | (20,000) | **(165,000)** |
| Rental Equipment/Fuel/Repair | (12,500) | (12,500) | (15,000) | (10,000) | (12,500) | (12,500) | (15,000) | (10,000) | **(100,000)** |
| **Subtotal - Operating Disbursements** | **(32,500)** | **(32,500)** | **(37,500)** | **(25,000)** | **(35,000)** | **(35,000)** | **(37,500)** | **(30,000)** | **(265,000)** |
| **Utilities and Information Technology Disbursements** | | | | | | | | | |
| Utilities | - | (1,000) | - | - | - | (1,000) | - | - | **(2,000)** |
| Information Technology | - | (9,149) | - | - | - | (9,149) | - | - | **(18,298)** |
| **Subtotal - Utilities and Information Technology Disbursements** | **-** | **(10,149)** | **-** | **-** | **-** | **(10,149)** | **-** | **-** | **(20,298)** |
| **Equipment, Office and Other Disbursements** | | | | | | | | | |
| Equipment Lease/Financing Payments | - | | (65,000) | | - | | | (65,000) | **(130,000)** |
| Office Leases | - | - | | | | | | - | **-** |
| Other Disbursements | (5,000) | (250,000) | (5,000) | (5,000) | (5,000) | (100,000) | (5,000) | (5,000) | **(380,000)** |
| **Subtotal - Equipment, Office and Other Disbursements** | **(5,000)** | **(250,000)** | **(70,000)** | **(5,000)** | **(5,000)** | **(100,000)** | **(5,000)** | **(70,000)** | **(510,000)** |
| **Chapter 11 Professional Fees** | | | | | | | | | |
| Legal Fees (Note 2) | (80,000) | - | - | (40,000) | - | - | (40,000) | - | **(160,000)** |
| Financial Advisory Fees (Note 3) | (75,909) | - | - | (40,000) | - | - | (40,000) | - | **(155,909)** |
| Bankruptcy Trustee Fees | | - | (35,000) | - | - | - | - | - | **(35,000)** |
| Other Chapter 11 Professional Fees | - | - | - | - | - | - | - | - | **-** |
| **Subtotal - Chapter 11 Professional Fees** | **(155,909)** | **-** | **(35,000)** | **(80,000)** | **-** | **-** | **(80,000)** | **-** | **(350,909)** |
| **Total Disbursements** | **(323,084)** | **(430,324)** | **(275,083)** | **(239,675)** | **(169,675)** | **(274,824)** | **(260,175)** | **(256,583)** | **(2,229,423)** |
| **Change in Cash** | **188,529** | **1,243** | **256,030** | **95,325** | **55,325** | **375,176** | **39,825** | **43,417** | **1,054,870** |
| **Cash Balance (End)** | **$ 203,253** | **$ 204,497** | **$ 460,526** | **$ 555,851** | **$ 611,176** | **$ 986,352** | **$ 1,026,177** | **$ 1,069,594** | **$ 1,069,594** |

| | **Notes** | |
|---|---|---|
| | Note 1 | Other receipts comprise proceeds from the sales of Company vehicles as well as advance payments for a project expected to commence in August 2026 |
| | Note 2 | Fees for Mulford Construction Corporation's legal advisors are shown at 80%. They received a retainer of $98,262 |
| | Note 3 | Fees for Traxi, LLC, Mulford Construction Corporation's financial advisors, are shown at 80%. They received a retainer of $30,000 |